## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

|  |  |
|---|---|
| JESSICA THOMPSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>EYECARE PARTNERS, LLC,<br><br>        Defendant. | Case No. 4:26-cv-228<br><br>**CLASS REPRESENTATION**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Jessica Thompson ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant EyeCare Partners, LLC ("ECP" or "Defendant" or "EyeCare Partners"), and alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action on behalf of herself and all other individuals similarly situated ("Class Members") against ECP for its failure to secure and safeguard the personally identifiable information ("PII") and private health information ("PHI") of Plaintiff and Class Members.

2.    ECP is a healthcare provider that operates a network of ophthalmologists and optometry practices across eighteen (18) states.[1] In the regular course of its business, ECP is required to maintain reasonable and adequate security measures to protect its patients' PII/PHI from

---

[1] EyeCare Partners, LLC, *About*, https://www.eyecare-partners.com/about/ (last visited Feb. 12, 2026).

unauthorized access and disclosure.

3.      Between December 3, 2024, and January 28, 2025, an unauthorized third party gained access to ECP's website and accessed files containing PII/PHI of patients of ECP's care facilities across the states (the "Data Breach").

4.      ECP owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. ECP breached its duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' PII/PHI from unauthorized access or disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their patients' and employees' data.

5.      ECP required its patients to provide it with sensitive PII/PHI and failed to protect it. ECP had an obligation to secure patients' PII/PHI by implementing reasonable and appropriate data security safeguards. This was part of the bargain between ECP and Plaintiff and Class Members.

6.      As a result of ECP's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI have been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI stolen here and the fact that the compromised PII/PHI is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their

PII/PHI, which PII/PHI is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiff brings this action on behalf of herself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring ECP to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9.      Plaintiff Jessica Thompson is a resident of the State of Kentucky, whose personal information was compromised in the Data Breach.

10.     Defendant ECP is a Missouri limited liability company with its principal place of business located at 15933 Clayton Road, Suite 210, Ballwin, MO 63011.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this Action under 28 U.S.C. § 1332(d), the Class Action Fairness Act. This is a civil action filed as a class action under Rule 23 of the Federal Rules of Civil Procedure. The proposed Class consists of at least 100 members; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one member of the Class is a citizen of a state different from at least one Defendant.

12.     This Court has personal jurisdiction over Defendant because its principal place of business is in Missouri, it regularly conducts business in Missouri, and maintains sufficient

minimum contacts in the state.

13.     Pursuant to 28 U.S.C. § 1391(b)(1)–(2), venue is proper in this Court because Defendant's principal place of business is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

14.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress ECP's willful and reckless violations of her privacy rights. Plaintiff and the other Class Members were patients who contracted with ECP.

15.     This action pertains to ECP's unauthorized disclosures of the Plaintiff's PII/PHI that occurred during the Data Breach.

16.     Between December 3, 2024, and January 28, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII/PHI.

17.     ECP disclosed Plaintiff's and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of ECP's failure to safeguard and protect their PII/PHI.

18.     By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, ECP assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

19.     Despite recognizing its duty to do so, ECP failed to implement security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

20.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI and relied on ECP to keep their PII/PHI confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

4

### 1.  *The Data Breach*

21.     According to a data breach notification ("Breach Notice") posted on ECP's website, unauthorized access to its network systems occurred between December 3, 2024, and January 28, 2025. During this period, an unauthorized third party accessed files from ECP's computer network that contained PII and PHI, including full names with dates of birth, Social Security Numbers (SSN), driver's licenses, health plan information, and patients' PHI.

22.     ECP only discovered the Data Breach on January 28, 2025. The Breach Notice posted on ECP's website did not specify detailed measures or actions taken by ECP to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

### 2.  *The Data Breach was Preventable*

23.     Had ECP maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, ECP could have safeguarded patient and patient data. ECP's lack of security controls and implementation of enhanced security measures only after the Data Breach are inexcusable.

24.     ECP was at all times fully aware of its obligation to protect patients' PII/PHI and the risks associated with failing to do so. ECP knew that information of the type collected, maintained, and stored by ECP is highly coveted and a frequent target of hackers.

25.     This exposure, along with the fact that the compromised PII/PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



26.    By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[2]

27.    Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

28.    When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[3]

29.    In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports,

---

[2] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), *available at* https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).
[3] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020), *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last accessed June 20, 2025).

the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[4]

30.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[5]

31.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[6]

32.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[7]

33.    In September 2020, the United States Cybersecurity and Infrastructure Security

---

[4] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[5] *Id.*

[6] *Id.*

[7] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited June 20, 2025).

Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[8]

34.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[9]

35.     The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10] Experian reports that a solen credit or debit card

---

[8]   Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sit es/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf, (last visited June 20, 2025).

[9]   *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (Last visited June 20, 2025).

[10]  Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available* at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 20, 2025).

number can sell for $5 to $110 on the dark web.[11] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

36.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[13]

37.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

38.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited

---

[11]    Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.
[12]    *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).
[13]    *Identity Theft and Your Social Security Number* (Oct. 2024), SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 20, 2025).

into the new Social Security number."[14]

39.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

40.     The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[15]

41.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

42.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

43.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts

---

[14] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 20, 2025).

[15] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 20, 2025).

or misuse of existing accounts.

44.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

45.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[16] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[17]

46.    The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### 3. *ECP Failed to Comply with the Federal Trade Commission*

47.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need

---

[16] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited June 20, 2025).
[17] *Id.*

for data security should be factored into all business decision-making.[18]

48.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[19] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

49.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

50.     Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to

---

[18] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 20, 2025).

[19] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.cliclaw.com/library/us-federal-laws/data-security/ftc-released-guide-protecting-personal-information-guide#:~:text=Protecting%20Personal%20Information%3A%20A%20Guide%20for%20Business%20October,card%20details%20to%20prevent%20fraud%20and%20identity%20theft (last visited June 20, 2025).

[20] *Id.*

[21] FEDERAL TRADE COMMISSION, *Start With Security*, *supra* note 17.

protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### 4. The Impact of Data Breach on Victims

51.     ECP's failure to keep Plaintiff's and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

52.     The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

53.     Further, malicious actors often wait months or years before using the PII obtained in data breaches, as victims become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

54.     Given the confirmed exfiltration of patient PII/PHI from ECP, many victims of the

Data Breach have likely already experienced significant harms, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, and checking credit reports.

55.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[22]

56.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations,

---

[22] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (May 2021), *available at* https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited June 8, 2025).

sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[23]

57.    Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

58.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[24]

59.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors who intend to use it for various fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

---

[23] *Id.*

[24] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

60.     As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

   a.   The unconsented disclosure of confidential information to a third party;

   b.   Unauthorized use of their PII/PHI without compensation;

   c.   Losing the value of the explicit and implicit promises of data security;

   d.   Losing the value of access to their PII/PHI permitted by ECP without their permission;

   e.   Identity theft and fraud resulting from the theft of their PII/PHI;

   f.   Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

   g.   Anxiety, emotional distress, and loss of privacy;

   h.   The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

   i.   Unauthorized charges and loss of use of and access to their accounts;

   j.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

   k.   Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

   l.   The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

61.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically involves significant time and effort. The Department of Justice's Bureau of Justice

Statistics found that identity theft victims reported spending an average of 7 hours resolving identity theft or fraud-related issues.[25]

62.      Plaintiff and Class Members place significant value in data security. According to a survey conducted by cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider that has stronger data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[26]

63.      Plaintiff and Class Members have a direct interest in ECP's promises and duties to protect PII/PHI, i.e., that ECP would *not increase* their risk of identity theft and fraud. Because ECP failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by ECP's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for ECP's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

64.      Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through ECP's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the

---

[25] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[26]      Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 20, 2025).

unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law principles of damages, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

65.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as ECP continues to retain their PII.

## CLASS ACTION ALLEGATIONS

66.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed Nationwide Class (herein "the Class"), defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose personally identifiable information or personal health information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

67.     Excluded from the proposed Class are any officer or director of EyeCare Partners; any officer or director of any affiliate, parent, or subsidiary of EyeCare Partners; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

68. <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1). Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from ECP's own records.

69. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether ECP engaged in the wrongful conduct alleged here;

b. Whether ECP's inadequate data security measures were a cause of the Data Breach;

c. Whether ECP owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

d. Whether ECP negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether ECP failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII and/or PHI;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

70. ECP engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

71. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of

the Members of the Class. All Class Members were subject to the Data Breach and had their PII and/or PHI accessed by and/or disclosed to unauthorized third parties. ECP's misconduct affected all Class Members in the same manner.

72.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

73.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against EyeCare Partners, making it impracticable for Class Members to individually seek redress for ECP's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation could lead to inconsistent or contradictory judgments and increase delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

74.     Plaintiff realleges paragraphs 1 through 73 as if fully set forth herein.

75.     Plaintiff brings this claim individually and on behalf of the Class.

76.     ECP owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII/PHI in ECP's possession was adequately secured and protected.

77.     ECP owed, and continues to owe, a duty to Plaintiff and the other Class Members to safeguard and protect their PII/PHI.

78.     ECP breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

79.     It was reasonably foreseeable that ECP's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

80.     As a direct result of ECP's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and the member of the Class's confidential medical information, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

81.    By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access ECP's systems containing the PII/PHI at issue, ECP failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which ECP has failed to do as discussed herein.

82.    ECP's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

83.    Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

84.    ECP's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

As a result of ECP's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in ECP's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

85.      Plaintiff realleges paragraphs 1 through 73 as if fully set forth here.

86.      Plaintiff brings this claim individually and on behalf of the Class.

87.      Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, EPC had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

88.      Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., ECP, as a healthcare provider handling electronic protected health information, had a duty to implement reasonable safeguards to protect Plaintiff's and Class members' Private Information.

89.      Pursuant to HIPAA, ECP had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304 (definition of encryption).

90.      ECP breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act, 15 U.S.C. § 45, and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Personal Information.

91.      ECP's failure to comply with applicable laws and regulations constitutes negligence *per se*.

92.      But for ECP's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

93.      The injury and harm suffered by Plaintiff and Class Members were the reasonably

foreseeable result of ECP's breach of their duties. ECP knew or should have known that it was failing to meet its duties, and that ECP's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

94.    As a direct and proximate result of ECP's negligent conduct, Plaintiff and Class Members now face an increased risk of future harm.

95.    As a direct and proximate result of ECP's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

96.    Plaintiff realleges paragraphs 1 through 73 as if fully set forth here.

97.    Plaintiff and Class Members either directly contracted with Defendant for health care services or employment.

98.    Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of receiving services or employment with Defendant.

99.    Plaintiff and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

100.    Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

101.    Plaintiff and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant in exchange for services or employment.

102.    In turn, and pursuant to its internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

103.    In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiff's and Class Members' Private Information.

104.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

105.    After all, Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

106.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

107.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with the execution of contracts and the discharge of performance and other duties according to their terms, mean preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with its substance as well as its form.

108.    Subterfuge and evasion violate the duty of good faith in performance, even when an actor believes their conduct is justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

109.    Defendant materially breached the contracts it entered into with Plaintiff and Class Members by:

        a.    failing to safeguard their information;

        b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

        c.    failing to comply with industry standards;

     d.   failing to comply with the legal obligations necessarily incorporated into the agreements; and

     e.   failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

110.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

111.    Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

112.    And, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

113.    Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

114.    Plaintiff realleges paragraphs 1 through 73 as if fully set forth here.

115.    By virtue of the special relationship between Defendant, as a medical provider, and Plaintiff and Class Members, ECP owed fiduciary duties with respect to Plaintiff's and Class Members' Private Information. In undertaking to receive, maintain, and exercise control over that Private Information, ECP assumed a fiduciary obligation.

116.    Through its undertaking and control of Plaintiff's and Class Members' Private Information, ECP became a fiduciary obligated to act primarily for the benefit of Plaintiff and Class Members with respect to that information.

117.    Defendant's fiduciary duty included, among other things, the obligation to:

     a.   protect the Private Information of Plaintiff and Class Members;

     b.   promptly detect and notify Plaintiff and the Class in the event of a data breach;

    c.  retain only vendors with adequate data security infrastructure, procedures, and protocols;

    d.  implement appropriate oversight and monitoring of vendors handling Private Information; and

    e.  employ safeguards consistent with FTC guidance, HIPAA requirements, and applicable industry standards to protect Private Information.

118.    In order to obtain medical services from Defendant, Plaintiff and Class Members were required to provide their Private Information.

119.    ECP knowingly accepted and maintained Plaintiff's and Class Members' Private Information in connection with providing medical services and thereby undertook the duties attendant to its possession and guardianship of that information.

120.    ECP owed a fiduciary duty to act for the benefit of Plaintiff and Class Members in matters within the scope of its relationship with them.

121.    ECP breached the fiduciary duties it owed by failing to safeguard Plaintiff's and Class Members' Private Information.

122.    ECP further breached those fiduciary duties by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach and by engaging a vendor with inadequate data security infrastructure, procedures, and protocols.

123.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including but not limited to:

    (i)  actual misuse of their Private Information in the form of identity theft and fraud;

    (ii)  loss of the opportunity to control the use of their Private Information;

    (iii)  unauthorized access, acquisition, disclosure, exfiltration, theft, and/or use of their Private Information;

(iv) out-of-pocket expenses incurred in preventing, detecting, and recovering from identity theft, fraud, and/or unauthorized use;

(v) lost opportunity costs associated with mitigation efforts;

(vi) continued risk to their Private Information while it remains in Defendant's possession without adequate protection; and

(vii) future costs in time, effort, and money to prevent, detect, and remediate the consequences of the Data Breach.

124.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer additional economic and non-economic harm.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

125.    Plaintiff realleges paragraphs 1 through 73 as if fully set forth herein.

126.    Plaintiff and Class Members conferred a monetary benefit upon ECP in the form of payments made to ECP for healthcare or related services, with an implicit understanding that ECP would use some of these payments to protect the PII/PHI it collects, stores, and uses to provide health care.

127.    ECP accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. ECP also benefited from the receipt of Plaintiff's and Class Members' PII/PHI, as this was used to facilitate billing and payment services and other aspects of ECP's business.

128.    As a result of ECP's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between its payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

129.    ECP should not be permitted to retain the money belonging to Plaintiff and the

Class Members because ECP failed to adequately implement the data privacy and security procedures that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

130.    ECP should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against EyeCare Partners, as follows:

(a)    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b)    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c)    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent ECP from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

(d)    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e)    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f)    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint

Dated: February 13, 2026

Respectfully submitted,

/s/ Mark E. Silvey
Mark E. Silvey (TN. Bar No. 013415)
Robert R. Jimenez (Fla. Bar. No. 72020)*
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
P: (919) 600-5003
msilvey@brysonpllc.com
lblacno@brysonpllc.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Class*